**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LUVENIA ROSS-THOMPSON

*Plaintiff,*

v.

RELIANCE FAMILY CARE SERVICES, INC, et. al.,

*Defendants.*

CIVIL ACTION
NO. 24-0043

**Pappert, J.** **September 28, 2026**

**MEMORANDUM**

Reliance Family Care Services, co-owned by Uwayemen Uwadiale and Regan Ataman, employed Luvenia Ross-Thompson as a site supervisor from October 19, 2022 to June 16, 2023. Ross-Thompson, who is African-American, contends RFCS discriminated against her in favor of Africans working at RFCS when it terminated her employment. Ross-Thompson further contends RFCS fired her because of complaints she made regarding the company's alleged discriminatory practices.

She sued RFCS, alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act, also alleging that Uwadiale and Ataman aided and abetted her termination and retaliation, subjecting them to individual liability under the PHRA. Defendants move for summary judgment and the Court, after reviewing the record evidence and holding oral argument, grants the motion in part and denies it in part.

I

RFCS provides in-person support to individuals and families with disabilities in community-based residential homes. (Defs.' Mem. of L. Ex. 3, Dkt. No.29-6 at 39.) Ross-Thompson, who is African-American, was employed by RFCS as a site supervisor. (Defs.' Mem. of L. Ex. 1, Dkt. No. 29-6 at 2.) Uwadiale and Ataman, both African, are RFCS' co-owners and serve as the COO and CEO, respectively. (*Id.*) As site supervisor, Ross-Thompson's responsibilities included "preparing written reports" and monitoring the "quality and completion of all paperwork" by staff working for her. (Defs.' Mem. of L. Ex. 9, Dkt. No. 29-6 at 190.) Toedy Slober, an African, was also a site supervisor at RFCS. (Defs.' Mem. of L. Ex. 1, Dkt. No. 29-6 at 2.) Ross-Thompson and Slober were both supervised by program coordinator William Lane, executive director Marie Julmice and program manager Estephanie Viaud. (*Id.*; Viaud Dep. Tr. 20:13–21:8.)

Ross-Thompson began working for RFCS on October 19, 2022. (Defs.' Mem. of L. Ex. 26, Dkt. No. 26-9 at 340.) On February 14, 2023, she and Slober were both given verbal warnings for "[f]ailure to complete work assignments." (Slober Verbal Warning, Dkt. No. 30 at 11; Ross-Thompson Verbal Warning, Dkt. No. 29-6 at 297.) On May 3, 2023, Ross-Thompson and Slober were both written up for a "lack of progress notes." (Defs.' Mem. of L. Ex. 18, Dkt. No. 29-6 at 309–10.) Then on May 19, Ross-Thompson and Slober were each given a $6,000 raise. (Slober Pay Raise, Dkt. No. 30 at 13; Ross-Thompson Pay Raise, Dkt. No. 29-6 at 343.) Ross-Thompson was written up a final time on May 26, and fired on June 19. (Defs.' Mem. of L. Ex. 25, Dkt. No. 29-6 at 334; Ex. 26, Dkt. No. 29-6 at 340.)

During Ross-Thompson's time at RFCS, she complained that there was discriminatory treatment towards non-Africans. (Ross-Thompson Dep. Tr. 90:2–91:13.) Specifically, she felt that African employees were treated more favorably and given preferential treatment with regards to scheduling. (*Id.*) Following her termination, Ross-Thompson filed this lawsuit alleging race and national origin discrimination, retaliation and a hostile work environment under Title VII, the PHRA and Section 1981 against RFCS. (Am. Compl. ¶¶ 50–65, Dkt. No. 23.) She also brought individual claims against Uwadiale and Ataman under the PHRA and Section 1981. (*Id.* ¶¶ 55, 56.) She withdrew her Section 1981 and hostile work environment claims under Title VII and the PHRA. (Pl.'s Mem. of L. at 8 n.1, Dkt. No. 33; Oral Arg. Tr. 27:24–28:5.)

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). The movant defendants have the burden of demonstrating that the plaintiff "has

failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non–moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III

Ross-Thompson contends she was subject to race and national origin discrimination under Title VII and the PHRA.[1] These claims are governed by the burden shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination, meaning: (1) she is a member of a protected class; (2) she was qualified

[1] Ross-Thompson's Title VII and PHRA discrimination claims are analyzed under the same framework and the Court considers them together. *Rosencrans v. Quixote Enters.*, 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

If the plaintiff succeeds in establishing the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. The defendant satisfies this burden "by introducing evidence, which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable [action]." *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 649 (E.D. Pa. 2021) (internal quotation marks omitted).

If the defendant articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is mere pretext. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). A plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal quotations omitted).

A

RFCS agrees Ross-Thompson is a member of a protected class, was qualified for the position and suffered an adverse employment action, (Defs.' Mem. of L. at 6, Dkt.

No. 29-3), but contends she cannot demonstrate that the circumstances of her termination give rise to an inference of discrimination.

To show an inference of discrimination, plaintiffs may introduce evidence that comparators–similarly situated persons outside the protected class–are treated more favorably under similar circumstances. *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024). Showing that employees are similarly situated includes "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quotation omitted). Ross-Thompson contends Toedy Slober, a site supervisor who was African, was a comparator. RFCS agrees that Slober occupied the same position and reported to the same supervisors. (Defs.' Mem. of L. at 7; Dkt. No. 29-3.) They both received multiple warnings regarding their work performance, yet Ross-Thompson was terminated, while Slober was not. *See infra* Section III.C. Ross-Thompson has met her burden, which is "not onerous," of establishing a *prima facie* case of discrimination. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

B

RFCS states, correctly, that the record shows it had a legitimate, non-discriminatory reason for firing Ross-Thompson. (Defs.' Mem. of L. at 9, Dkt. No. 29-3.) RFCS highlights that Ross-Thompson was subject to multiple warnings regarding her job performance, specifically a failure to turn in required paperwork. (*See* Ross-

Thompson Verbal Warning, Ex. 14, Dkt. No. 29-6 at 297; Ross-Thompson Written Warning, Ex. 24, Dkt. No. 29-6 at 328; Ross-Thompson Final Warning, Ex. 25, Dkt. No. 29-6 at 334.) Her termination letter stated the cause as "failure to hand in the proper paperwork and violating policies and procedures." (Ross-Thompson Termination Letter, Ex. 26, Dkt. No. 29-6 at 340.) This evidence satisfies RFCS' "relatively light" burden of showing a legitimate, nondiscriminatory reason for the termination. *Fuentes*, 32 F.3d at 763.

C

To establish pretext, a plaintiff must point to evidence from which a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Fuentes*, 32 F.3d at 764. The plaintiff can satisfy the second prong by demonstrating that "the employer treated other, similarly situated persons not of his protected class more favorably." *Id.* at 765.

Ross-Thompson points to Toedy Slober, a site supervisor who is African, as her comparator, (Pl.'s Mem. of L. at 5, Dkt. No. 33), and RFCS does not dispute that Slober occupied the same position and reported to the same supervisors. (Defs.' Mem. of L. at 7, Dkt. No. 29-3.) On February 14, 2023, Ross-Thompson and Slober were both given verbal warnings for their "[f]ailure to complete work assignments." (Slober Verbal Warning, Dkt. No. 30 at 11; Ross-Thompson Verbal Warning, Dkt. No. 29-6 at 297.) The disciplinary forms filled out by their supervisor, Estephanie Viaud, were completed just 12 minutes apart and each state they "failed to ensure staff completed their work

assignment," along with recommending the same corrective action for both. (Slober Verbal Warning; Ross-Thompson Verbal Warning.)

On May 3, William Lane, the RFCS Program Coordinator, wrote up Ross-Thompson and Slober for a "lack of progress notes." (Defs.' Mem. of L. Ex. 18, Dkt. No. 29-6 at 309–10.) As of May 15, both Ross-Thompson and Slober continued to have missing paperwork. (Defs.' Mem. of L. Ex. 22, Dkt. No. 29-6 at 320–21.) Four days later, on May 19, they both received the same pay raise, increasing their annual salary from $44,000 to $50,000. (Slober Pay Raise, Dkt. No. 30 at 13; Ross-Thompson Pay Raise, Dkt. No. 29-6 at 343.) Ross-Thompson testified that when she received the pay raise Uwadiale and Ataman told her she was "doing a good job" and "deserved it." (Ross-Thompson Dep. Tr. 178:16–21.) She was nonetheless fired on June 19. (Defs.' Mem. of L. Ex. 26, Dkt. No. 29-6 at 340.)

RFCS argues that Ross-Thompson and Slober's work performance diverged after the May 3 warning. (Defs.' Mem. of L. at 7, Dkt. No. 29-3.) RFCS points to testimony from Julmice that Slober went from "being one of the worst supervisors" to "getting her work done." (Julmice Dep. Tr. 77:21–78:10.) RFCS also points to a June 13 email where Slober has her paperwork complete, but Ross-Thompson does not. (Defs.' Mem. of L. Ex. 23, Dkt. No. 29-6 at 325–26.) But, "similarly situated does not mean identically situated." *Opsatnik*, 335 F. App'x at 222 (quotation omitted). The record shows she and Slober had the same job, with the same supervisor, were being paid the same salary, received the same raise at the same time and both received multiple warnings about their performance. Yet, Ross-Thompson, and not Slober, was fired.

A plaintiff can also demonstrate "inconsistencies" in the "employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal quotations omitted). Crucially here, no one seems to really know for sure who fired Ross-Thompson. Benjamin Keene, the HR Manager, testified that Uwadiale made that decision, (Keene Dep. Tr. 22:24–23:5), while Julmice testified that Uwadiale told Julmice to "give corrective [] action" to Ross-Thompson, which would have been termination. (Julmice Dep. Tr. 73:1–7.) For her part, Uwadiale said she was not involved in Ross-Thompson's firing, but that Keene and Julmice made that decision. (Uwadiale Dep. Tr. 126:24–127:6.)

This evidence could cause a factfinder to "reasonably either (1) disbelieve [Defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendant's] action." *Fuentes*, 32 F.3d at 764.

IV

Ross-Thompson also asserts retaliation claims under Title VII and the PHRA.[2] To establish a *prima facie* case for retaliation, Ross-Thompson must prove: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Daniels v. Sch. Dis. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

A

Title VII provides that it shall be unlawful for an employer to discriminate against an employee because she has "opposed any practice made an unlawful

[2] Retaliation claims under Title VII and the PHRA are also analyzed under the same framework. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Informal complaints of discrimination that are directed at co-workers rather than management may constitute protected activity for purposes of establishing a prima facie case of retaliation. *Hazen v. Mod. Food Servs. Inc.*, 113 F. App'x 442, 444 (3d Cir. 2004); *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135–36 (3d Cir. 2006). But the complaint must convey the speaker's express or implicit protest of discriminatory practices, as a "general complaint of unfair treatment is insufficient to establish protected activity." *Curay–Cramer*, 450 F.3d at 135. As long as "it is possible to discern from the context of the statement that an individual opposed an unlawful practice" it is protected activity. *Dawn L. v. Greater Johnston Sch. Dist.*, 586 F. Supp. 2d 332, 374 (W.D. Pa. 2008) (quoting *Curay-Cramer*, 450 F.3d at 135–36).

Ross-Thompson alleges she raised concerns of discriminatory treatment towards non-African employees to Lane, RFCS' Program Coordinator, and Julmice, one of her supervisors. Ross-Thompson specifically states that she complained to Lane about the disparate treatment regarding scheduling, saying "African employees would be allowed to take two months off to go back to their country, and when they come back their position is still held." (Ross-Thompson Dep. Tr. 90:23–91:13.) Whereas "[a]n African-American employee can take off maybe a week or two and come back and their position is in question." (*Id.*) Ross-Thompson also testified that she reported "immense favoritism in many ways to Africans" to Julmice. (*Id.* at 154:5–12.) These complaints constitute protected activity under Title VII and the PHRA.

B

RFCS fired Ross-Thompson, allegedly because of her protected activity, on June 19, 2023. (Pl.'s Mem. of L. at 16, Dkt. No. 33.) But causation, "which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997). Generally, a plaintiff may show causation in three ways: (1) the timing of the adverse action; (2) by a pattern of animus during the interval between the protected activity and the adverse action; or (3) by other circumstantial evidence concerning the employer's motivation. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).

Ross-Thompson says she complained about unfavorable treatment as compared to similarly situated African coworkers within three months of her termination, which could show a causal connection. (Pl.'s Mem. of L. at 19–20, Dkt. No. 33.) But there is nothing in the record to support that assertion. The only time frame Ross-Thompson is able to pin down is when she reported an incident of "verbal abuse" to Lane and Julmice, that occurred "about a month and a half" before she was terminated. (Ross-Thompson Dep. Tr. 77:14–21; 78:14–19.) But this complaint was not protected activity. She did not complain about discriminatory practices, only that a worker was being "abusive" to a client. (*Id.*) Ross-Thompson gives no general or specific dates for when she allegedly complained about discrimination and there is nothing in the record from which reasonable jurors could connect the dots.[3]

[3] Counsel at oral argument referenced a conversation between Ross-Thompson and Uwadiale to establish a timeframe for Ross-Thompson's complaints. (Oral Arg. Tr. 60:21–61:24.) But Ross-Thompson did not raise concerns of discriminatory practices during that conversation, which was focused on pressure from her supervisors to "complete documentation." (Ross-Thompson Dep. Tr. 82:7–83:9.)

A plaintiff may also demonstrate causation by showing an intervening pattern of harassment, antagonism or hostility. *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895–96 (3d Cir. 1993). The record does not show any evidence of antagonism or harassment following Ross-Thompson's complaints about disparate treatment between Africans and African-Americans to Lane and Julmice. (*See supra* Section IV.A.)

While Ross-Thompson claims she was told that if she challenged Uwadiale's authority she "would have a target on [her] back," Ross-Thompson also testified that she never personally observed anything that led her to believe Uwadiale or Ataman "would retaliate against anybody that challenged [their] authority." (Ross-Thompson Dep. Tr. 85:22–87:23.) And there is nothing in the record to show that Ross-Thompson ever complained to Uwadiale about unlawful discrimination. Again, she alleges only that she spoke to Uwadiale about pressure from Ross-Thompson's supervisors to "complete documentation." (Ross-Thompson Dep. Tr. 82:4–83:8.) When asked about the employee handbook regarding employment protection and the whistleblower policy, Ross-Thompson testified that she had no "concerns about being retaliated against." (*Id.* at 85:7–21.) Viewing the evidence in the light most favorable to Ross-Thompson, no reasonable jury could find a causal link between her protected activity and termination.

V

Ross-Thompson also alleges Ataman and Uwadiale are individually liable under the PHRA for aiding and abetting her termination. (Am. Compl ¶¶ 55, 56, Dkt. No. 23.) Individual defendants may be liable under § 955(e) of the PHRA, which "forbids 'any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act'" that is an "unlawful discriminatory

practice" under the PHRA. *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552 (3d. Cir 1996) (quoting 43 Pa. Cons. Stat. Ann. § 955(e) (West)). An individual supervisory employee can be "held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998).

There is no evidence of Ataman's direct involvement in Ross-Thompson's firing or his failure to take action to prevent it. Ross-Thompson points only to a statement by program manager Estephanie Viaud that Ataman and Uwadiale "made the decisions together sometimes." (Viaud Dep. Tr. 112:2–12.) No reasonable jury could find Ataman played any role in Ross-Thompson's termination based on that.

But there are genuine issues of material fact as to Uwadiale's individual liability under the PHRA. As a co-owner of RFCS, Uwadiale is a supervisor and therefore a proper defendant under § 955(e). *Dici*, 91 F.3d at 533. And again, Julmice, Keene and Uwadiale blame each other for the decision to fire Ross-Thompson. (*See supra* Section III.C.) There is a genuine dispute as to Uwadiale's role in Ross-Thompson's termination, precluding summary judgment on the PHRA aiding and abetting claim.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.